UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-80178-CIV-MIDDLEBROOKS/JOHNSON

JEFFREY O.   et al.,

     Plaintiffs,

vs.

CITY OF BOCA RATON,

     Defendant.

_____/

**FINAL ORDER**

    This cause came before the Court for final disposition during a non-jury trial from January 22, 2007 through January 29, 2007.  Plaintiffs brought suit against the Defendant City of Boca Raton in March 2003, alleging that it violated the Fair Housing Act, 42 U.S.C. §3601 et seq. (FHA), Title II of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq. (ADA), and the 14th Amendment to the United States Constitution by passing Ordinance 4649, as amended by Ordinance 4701, and Section 28-2.  Primarily, Plaintiffs allege that the City's actions discriminate against them based on their handicapped status where these two zoning provisions limit the ability of Plaintiffs to reside in residential areas of the City.  Pursuant to Federal Rule of Civil Procedure 52(a), I make the following findings of fact and conclusions of law.

**Facts**

    Plaintiffs are individuals who are recovering alcoholics and drug addicts ("Individual Plaintiffs"), as well as corporate entities ("Provider Plaintiffs") which provide housing and additional services to approximately 390 recovering individuals in areas zoned for residential use

within the Defendant City of Boca Raton ("City").  Steve Manko is the president of Provider Plaintiffs who own a number of apartment buildings which are marketed to recovering individuals as sober housing.  In their sober housing, Provider Plaintiffs provide different levels of oversight to their residents, including, but not limited to drug testing, curfews, room checks, medication controls, and group meetings.

In 2002, the City was faced with the dilemma of how to regulate sober houses, such as Provider Plaintiffs'.  Ordinance Number 4649 was proposed to deal with the issue.  At the city council meeting where the council took up this ordinance, many residents of the City spoke specifically about Provider Plaintiffs' facilities and their impact on the neighborhood.  Provider Plaintiffs served approximately 390 individuals in 14 apartment buildings, all of which are within a quarter of a mile of each other.  The residents of the City expressed many concerns, including the way in which Provider Plaintiffs operated their business.  Specifically, residents spoke to Provider Plaintiffs' policy of evicting individuals who relapse while keeping the person's deposit[1] and kicking individuals out with no where to go when they relapsed.  The residents were also concerned about the changing dynamic of their neighborhood where the individuals living in Provider Plaintiffs' buildings frequently loitered in front of the apartment buildings, did not stay for more than a few months, and were often from out of town.  There were also a lot of broad generalizations made by residents at the meeting, regarding the negative impact a high concentration of recovering individuals had on their neighborhood.  One resident testified that he was able to purchase drugs at Boca House.  At that meeting, the city council passed Ordinance Number 4649.  The city council later passed Ordinance 4701 which amended Ordinance 4649.  Ordinance Number 4649, as amended by Ordinance Number 4701 ("Ordinance 4649") states:

---

[1] Residents of Provider Plaintiffs paid rent by the week, rather than on a monthly basis.  There was testimony that at least one individual relapsed multiple times in a one-month span, allowing Manko to keep the individual's deposit each time.  This testimony was further supported by Provider Plaintiffs' damage expert who when calculating lost profits included over ten percent of Provider Plaintiff's total income as that derived from lost deposits.

Substance Abuse Treatment Facility shall mean a service provider or facility that is: 1) licensed or required to be licensed pursuant to Section 397.311(18). Fla. Stat. or 2) used for room and board only and in which treatment and rehabilitation activities are provided at locations other than the primary residential facility, whether or not the facilities used for room and board and for treatment and rehabilitation are operated under the auspices of the same provider.  For the purposes of this subparagraph (2), service providers or facilities which require tenants or occupants to participate in treatment or rehabilitation activities, or perform testing to determine whether tenants or occupants are drug and/or alcohol free, as a term or condition of, or essential component of, the tenancy or occupancy shall be deemed to satisfy the "treatment and rehabilitation activities" component of the definition contained in this section.

The Ordinance requires that Substance Abuse Treatment Facilities as defined above be located in the City's Medical Center District, or with approval, in a Motel/Business district.

The City put forth evidence to establish that in passing Ordinance 4649 it was attempting to group together compatible uses and separate non-compatible uses.  For example, the City's Mayor testified that Provider Plaintiffs engaged in commercial and medical uses, therefore making them appropriately placed in medical or commercial zones.  The City's planning and zoning director testified that Provider Plaintiffs' facilities which offered a "unique recovery program" were different from normal apartment buildings.  The planning and zoning director also explained that the services provided by Provider Plaintiffs were not residential in character.  Therefore, where the services provided were not residential in character, Provider Plaintiffs' facilities should not be located in a residential area according to the planning and zoning director.

Provider Plaintiffs' buildings are located in an area with other multi-family residences.  In addition, the area in which Provider Plaintiffs' buildings are located is very close to commercial areas.  The appearance of Provider Plaintiffs' buildings does not stand out in the area.  There was no evidence at trial as to how Provider Plaintiffs' facilities impacted the surrounding residential area, including but not limited to additional cars in the area, additional foot traffic in the area, a burden on public resources, or even an appearance that was out of character with the area.

3

Also involved in this case, is a provision of the City Code, Section 28-2, which defines the term family as:

> 1 person or a group of 2 or more persons living together and interrelated by bonds of consanguinity, marriage, or legal adoption, or a group of persons not more than 3 in number who are not so interrelated, occupying the whole or part of a dwelling as a separate housekeeping unit with a single set of culinary facilities. The persons thus constituting a family may also include gratuitous guests and domestic servants. Any person under the age of 18 years whose legal custody has been awarded to the state department of health and rehabilitative services or to a child-placing agency licensed by the department, or who is otherwise considered to be a foster child under the laws of the state, and who is placed in foster care with a family, shall be deemed to be related to a member of the family for purposes of this chapter. Nothing herein shall be construed to include any roomer or boarder as a member of a family.

The City requires a residential dwelling unit be occupied by one family. Therefore, this provision limits the amount of unrelated people who can live in a residential dwelling unit in the City.

Individual Plaintiffs and the current residents of Provider Plaintiffs who testified were all recovering alcoholics or drug addicts. Because of their addiction, these individuals lost jobs and families, and some were unable to keep a roof over their head during their active addiction. One Plaintiff testified that personal hygiene was the first ability he lost during a relapse. He did not take care of himself, including self-grooming and eating. A current resident of Provider Plaintiffs testified that during her active addiction she was homeless. Each of the recovering individuals testified as to the difficulties they were faced with as addicts, including an inability to possess large amounts of money, have an intimate relationship with another person, or be around people consuming alcohol or using drugs. Recovery from alcohol or drug addiction is an ongoing process, which for many individuals can be a lifelong process. At one time each of the Individual Plaintiffs lived in Provider Plaintiffs' apartment buildings. They also testified that if they relapsed they would return to live in Provider Plaintiffs' residences. The restrictions

imposed by Provider Plaintiffs during the residents' early stages of recovery aided these individuals as they advanced through their recovery.

Plaintiffs' expert, Riley Regan, testified as to the impact addiction has on one's life, not just during active addiction, but also for the rest of his or her life. It is common for recovering individuals to need to live in an environment that is drug and alcohol free in order to further their recovery. Regan stated that without drug testing there is no way for everyone to be sure that the living environment is drug and alcohol free. This testimony was also supported by the recovering individuals who testified that drug testing kept them motivated to stay sober and kept them safe. Regan also testified about the need for recovering individuals not to live alone because loneliness can trigger a relapse and living with other individuals imposes an accountability to other people. This testimony was in line with that of the recovering individuals who testified where they described loneliness and boredom as possible triggers to relapses. This is not to say that some of the individuals wanted to live alone and did live alone, but many acknowledged the benefits they had and could reap from living with other recovering individuals.

Provider Plaintiffs provided many tools to recovering individuals to aid in their recovery. It is more than just housing, it was also characterized as a treatment model. While this is arguably a laudable endeavor on Manko's behalf, his business model did not always appear to be so altruistic. Manko's positions regarding what services he provided and what legal arrangement he had with his residents shifted depending on the implications of such for his business model, more than for the therapeutic needs of his residents. For example, prior to this litigation, recovering individuals executed a license agreement with Provider Plaintiffs in what may have been an effort to escape traditional landlord/tenant laws. However, such individuals now execute a lease. This change in terminology coincides with Manko's current suit which seeks protection from the Fair Housing Act and his attempt at differentiating himself from the commercial use

5

that concerned the City.  Instead, Manko is attempting to focus on the housing aspect of the services he provides.  Provider Plaintiffs continue to market themselves in the recovering community as a provider of a "unique recovery program."  Provider Plaintiffs' marketing literature uses terms like "Three-Phase Transitional Recovery Program."  All of these facts support the conclusion that Provider Plaintiff is providing more than housing.

Manko's history with the City and his shifting position is also exemplified by his agreement with the City to comply with Section 28-2, but failing to do so.  In 1996, Manko was cited for violating the occupancy limitation of the City code.  That same year Manko entered in a stipulation with the City agreeing not to have more than three unrelated persons occupying a single unit.  Again in 2001, Manko was cited with the same violation and again informed the City that he was seeking to comply with Section 28-2, although occasionally violated the limitation because of unexpected events.  At trial it became clear that Manko never consistently limited his units to three individuals.  Furthermore, at trial Manko argued that having more than three individuals in a unit[2] was essential to the residents' recovery.  However, Manko's decision to continue to put more than three individuals in a unit could reasonably have been based on economics.  Provider Plaintiffs charged $170 a week for each recovering individual.  With four people in a unit, Provider Plaintiffs grossed approximately $2,720 a month per unit.  Manko testified that the same unit rented to a family of four would go for approximately $1,200, less than half of what Provider Plaintiffs made by placing more than three recovering individuals in each unit.  This calculation may have played into Manko's continued violation of Section 28-2.  Provider Plaintiffs' continued profitability is exemplified by their ability to acquire a significant number of apartment buildings in the area.

Manko's questionable business practices aside, the evidence at trial did demonstrate that

_____

[2]Manko's position at trial was that each bedroom needed to have two people in it to be most therapeutically effective.  This position made Section 28-2 applicable to most of Manko's units where most of the apartments in his apartment buildings had more than one bedroom.

the two provisions Plaintiffs challenge limit the ability of recovering individuals to obtain housing within the residential areas of the City.  The recovering individuals testified about the importance of living in a residential area because there are many more temptations in commercial zones, such as bars and hotels which recovering addicts would frequent during their active addition.  Therefore, it would be more difficult for them to maintain their sobriety while living in such areas.  As discussed above many recovering individuals need, at least at one point during their recovery, to live in a substance-free environment and their recovery is further supported by group living arrangements, both for the practicality of day-to-day living, as well as, the economic viability of such housing arrangements.

Plaintiffs' claims include a claim for a reasonable accommodation.  The City put forth evidence that its Petition for Special Case Approval form was the form an individual would use to request a reasonable accommodation.  This form makes no mention of a reasonable accommodation or a disability.  The City attorney testified that this form is how a person or entity would request a reasonable accommodation.  The form lists five different options for which it is a petition for, none of which is a reasonable accommodation.  The City attorney testified that an applicant would check the sixth box which states Other (specify), with a blank line.  The City's zoning code made no provision for individuals to request a reasonable accommodation from zoning and land use restrictions based on disability.

**Law**

Plaintiffs bring claims under the Fair Housing Act, 42 U.S.C. §3601 et seq., the American with Disabilities Act, 42 U.S.C. §12131 et seq., and the 14th Amendment to the United States Constitution.  I begin with Plaintiffs' Federal Fair Housing Act claim because I think that is where the crux of this case lies.

**Standing**

Plaintiffs assert they have standing to bring a claim under the FHA because they are

disabled due to their recovering status.  The City disagreed asserting, amongst other things, that the evidence supported the position that the recovering individuals could complete all major life activities.  The FHA defines handicap with respect to an individual as having "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. §3602(h).  The existence of such handicap must be examined on a case-by-case basis.  *See Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).[3]  Major life activities include walking, learning, performing manual tasks, getting an apartment, being unable to perform a class of jobs, and caring for oneself.  *Rossbach v. City of Miami*, 371 F.3d 1354, 1357-59 (11th Cir. 2004); *U. S. v. S. Mgmt. Corp.*, 955 F.2d 914, 919 (4th Cir. 1992).  To substantially limit means a long-term, permanent restriction, or considerable.  *See Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 196 (2002)(speaking to the definition of substantial as including considerable); *Rossbach*, 317 F.3d at 1357.  The recovering individuals testified about the negative impact their addiction had on their lives, including preventing them from caring for themselves or keeping a home at times, and losing jobs and families.  All of these things impacted their everyday lives in a significant way.  All Individual Plaintiffs and current residents of Provider Plaintiffs testified, that at one time, they had because of their addiction been unable to perform one of these major life activities.  For some the deprivation was long-term.  For others the deprivation may have been short-term, but repeated itself with frequency when he or she would relapse and again find themselves without their family, their home, their job, or ability to care for his or herself.  The evidence established that the individuals involved suffered an impairment which qualified them as disabled under the FHA.

The position that recovering individuals can be considered disabled is supported both in

---

[3]While the *Kirkingburg* case dealt with the American with Disability Act, as courts have noted the definitions under the two acts, one of disability and the other using the term handicap, are "almost verbatim."  *Bragdon v. Abbot*, 524 U.S. 624, 631 (1998).  Accordingly, I will use the terms and applicable analyses interchangeably.

case law and legislative history.[4]   "As a medical matter, addiction is a chronic illness that is never cured but from which one may nonetheless recover." *S. Mgmt. Corp.*, 955 F.2d at 920. "Alcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA, the ADA, and the Rehabilitation Act." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002)("*RECAP*").   Congress intended to treat drug addiction as a significant impairment constituting a handicap unless excluded, such as by current drug use in accordance with 42 U.S.C. §3602(h). *See Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Township*, 455 F.3d 154, 156 n.5 (3d Cir. 2006); *RECAP*, 294 F.3d at 46; *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 338-39 (6th Cir. 2002); *S. Mgmt. Corp.*, 955 F.2d at 919.   The Fourth Circuit specifically spoke to the need for addicts to be given equal access to housing, instead of being denied housing on the basis of their constant craving and its accompanying dangers. *S. Mgmt. Corp.*, 955 F.2d at 922.   I do not pass on the question of a *per se* disability for recovering alcoholics or drug addicts.   As a matter of fact I do not think a *per se* rule is appropriate in these circumstances where the court's obligation is to do a case-by-case evaluation to determine if an individual is handicapped.   However, that does not preclude these individuals from satisfying the definition.   Their testimony was moving and credible.

The definition of disability includes two other possibilities by which Plaintiffs can demonstrate their standing under the FHA, having had a record of the type of impairment discussed above, or being regarded as having such an impairment.   42 U.S.C. §12102(2).   In order to demonstrate that an individual is handicapped due to having had a record of an impairment, the individual must have satisfied the first definition at some point. *See Burch v.*

---

[4]This position is also supported by 28 C.F.R. §35.104(4)(1)(ii) which specifically references drug addiction and alcoholism as one meaning of physical or mental impairment in regards to nondiscrimination on the basis of disability in state and local government services.   This section of the Code of Federal Regulations also directly addresses individuals who have successfully completed a rehabilitation program.   28 C.F.R. §35.131(a)(2) states "[a] public entity shall not discriminate on the basis of illegal use of drugs against an individual who is not engaging in the current use of drugs and who - -"   is participating in a supervised rehabilitation program or successfully completed a rehabilitation program.

*Coca-Cola Co.*, 119 F.3d 305, 321 (5th Cir. 1997).  All the individuals who testified at trial had experienced active drug or alcohol addiction at one point in their lives.  As discussed above, the Individual Plaintiffs and current residents had been homeless, unable to hold down a job, or take care of themselves during their active addiction.  Active addiction and its recovery are not short-term problems.  They are long-term and for many require permanent diligence to maintain their sobriety.  Their addiction particularly in its active stages substantially limited major life activities.  This evidence supported these individuals having met the first definition, at the very least during their active addiction.  Therefore, even if the above analysis is incorrect as to the individuals currently satisfying the first definition, where during their active addiction they satisfied the first definition, Individual Plaintiffs have a record of such an impairment making them handicapped under the second definition of the FHA.

There are two additional points I would like to make regarding the matter of standing in this case.  First, is that the Individual Plaintiffs are not current residents of Provider Plaintiffs.  However, they did testify that if they were to relapse they would return to Provider Plaintiffs' residences for some period of time during their recovery after they completed detoxification.  For cases brought under the FHA, standing is to be as broad as the Constitution permits.  *See Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1537 (11th Cir. 1994).  *Jackson* involved a plaintiff's challenge to the site selection process regarding a public housing project.  *Id.*  Plaintiff was wait-listed for the project and stated her intention to probably move in once it was built.  *Id.*  In this case, Individual Plaintiffs stated their intention to return to Provider Plaintiffs' residences should they relapse, which is a constant significant risk for recovering individuals.  This is a similar position to that of the plaintiff in *Jackson*.  Given Individual Plaintiffs' stated intention to return upon the happening of a certain likely event and the broad policy of standing under the FHA, I

conclude the Individual Plaintiffs have standing to challenge the City's action.[5]

The other point I want to make involves the propriety of Provider Plaintiffs' standing. FHA cases are often brought by a provider of housing on behalf of the residents it seeks to house. *See Brandt v. Vill. of Chebanse, Ill.*, 82 F.3d 172, 173 (7th Cir. 1996); *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781 (6th Cir. 1996). Moreover, Provider Plaintiffs' status as a profit enterprise does not negate such standing. *See Brandt*, 82 F.3d at 173(case brought by residential housing developer); *Smith & Lee Assocs., Inc.*, 102 F.3d at 781(suit brought by profit owner of group home). Accordingly, all parties to this action have standing to bring their FHA claims.

**Merits of Plaintiffs' claims under the Fair Housing Act**

This case tests the limits of the protection provided by the FHA and a municipality's ability to legislate in an effort to preserve the character of its residential neighborhoods. Legally this is a difficult case where Plaintiffs are protected by the FHA, but exactly how that protection impacts the City's acts is unclear. The case is made more difficult by its facts where the City claims it was attempting to do something that while possibly permissible under the law, is not what it did by passing the Ordinance. My conclusion in this case is that the City's actions challenged here are limited by the FHA, the question is how limited.

Plaintiffs argued that the City's ordinances are discriminatory and thus, in violation of the FHA. The City responded that it was merely trying to move commercial/medical uses out of residential areas. 42 U.S.C. §3604(f) of the FHA prohibits a public entity from discriminating against disabled persons by denying such persons the ability to live in a dwelling. The amendments to the FHA, which added handicapped individuals, were a statement by Congress of the commitment to end the unnecessary exclusion of individuals with disabilities from American

---

5 This is also supported by the statute which talks about who may bring a suit under the FHA as an aggrieved person which is defined to include any person who "believes that such person *will be* injured by a discriminatory housing practice that is about to occur." 42 U.S.C. §3602(i)(emphasis added).

mainstream where such exclusion was often based on generalizations and stereotypes of people's disabilities and the attendant threats of safety that often accompanied these generalizations.  *See Elliot v. City of Athens, GA*, 960 F.2d 975, 978 (11th Cir. 1992)(discussing the House Report on the Fair Housing Amendments Act) *abrogated by, City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995).  Congress intended for the FHA to apply to zoning ordinances.  *See Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996)(discussing the explicit intent of Congress to have the FHA apply to zoning laws).   However, the FHA does not pre-empt or abolish a municipality's power to regulate land use and pass zoning laws.  *See Hemisphere Bldg. Co., Inc. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999)*; Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 603 (4th Cir. 1997).  "Land use restrictions aim to prevent problems caused by the 'pig in the parlor instead of the barnyard.'" *City of Edmonds,* 514 U.S. at 732 (quoting *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926)).  The amendments to the FHA were intended to prohibit the use of zoning regulations to limit "the ability of [the handicapped] to live in the residence of their choice in the community."  H.R.Rep. No. 100-711, 100th Cong., 2d Sess 24 (1988), U.S. Code Cong. & Admin. News 1988, pp. 2173, 2185.  The intersection between these two principles is where this case meets.

It is against this backdrop that I address Plaintiffs' claims.  Plaintiffs challenge two provisions of the City's zoning code, Ordinance 4649 and Section 28-2.  Plaintiffs' argument is that each ordinance on its own, and the two in combination effectively limit the ability of recovering individuals to live in residential areas of the City in violation of the FHA.  There are two ways to prove a violation of the FHA.  *See Larkin,* 89 F.3d at 289.  First is by showing that the defendant was motivated by a discriminatory intent against the handicapped.  *Id.*  The second is where a defendant's actions are neutral, but have a discriminatory effect, thus having a disparate impact on the handicapped.  *Id.*  Plaintiffs argued they have proven a violation of the FHA under both avenues.  This case does implicate both avenues.  Plaintiffs' claim as to

Ordinance 4649 is best analyzed under the discriminatory intent theory while Plaintiffs' claim as to Section 28-2 is most appropriately analyzed under the disparate impact theory. Accordingly, I will address them separately.

**Ordinance 4649**

I begin with Plaintiffs' challenge to Ordinance 4649. Ordinance 4649 defines substance abuse treatment facilities and requires them to be in the City's medical district or with a conditional permit in a motel/business district. An ordinance facially discriminates against the handicapped where it singles them out and applies different rules to them. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995); *Marbrunak, Inc. v. City of Stow*, 974 F.2d 43, 46-47 (6th Cir. 1992). As applied to this case, the question is not whether the City was specifically intending to discriminate against Plaintiffs, but rather whether the ordinance on its face treats recovering drug addicts and alcoholics different from non-handicapped individuals. *See Larkin,* 89 F.3d at 290 (discussing how a defendant's benign motive does not prevent a statute from being discriminatory on its face); *see also Alexander v. Choate*, 469 U.S. 287 (1985)(discussing how discrimination against the handicapped is often the result of thoughtlessness, not particular offensive anger). The language of the Ordinance singles out recovering individuals where they are the individuals who would be residing in a substance abuse treatment facility. *See McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992)(discussing how discrimination against an individual because of his or her handicap is often aimed at an effect of the handicap rather than the handicap itself). While this does not mean that all recovering individuals live in a substance abuse treatment facility, there was no evidence, nor did anyone argue that non-recovering individuals live in substance abuse treatment facilities. Accordingly, Ordinance 4649 treats recovering individuals differently from non-recovering individuals where it requires the individuals who live in substance abuse treatment facilities, recovering individuals, to live in the City's medical zone or with conditional approval in a motel/business zone. This is

13

sufficient to establish a prima facie case of discrimination.  However, my analysis does not end here.

Next, I must determine if the City's differential treatment of recovering individuals is justified such that it is not in violation of the FHA.  The Eleventh Circuit has not addressed the standard a governmental defendant must meet to justify disparate treatment under the FHA.[6]  Therefore, I look to other circuits for guidance on what the City is required to prove to establish that this distinction is not discriminatory under the FHA.  *See McAbee v. City of Fort Payne*, 318 F.3d 1248, 1252 (11th Cir. 2003)(looking to other circuits for guidance as to what standard to apply where the Eleventh Circuit had not adopted one yet).  Four United States Courts of Appeals have addressed this issue.  *Cmty. House, Inc. v. City of Boise, Idaho*, 468 F.3d 1118 (9th Cir. 2006); *Larkin*, 89 F.3d 285; *Bangerter*, 46 F.3d 1491; *Familystyle of St. Paul, Inc. v. City of St. Paul, Minn.*, 923 F.2d 91 (8th Cir. 1991).  The Eighth Circuit was the first to develop a test to be used in these situations, but none of the other circuits confronted with the issue have chosen to follow the Eighth Circuit's analysis.  In *Familystyle*, the Eighth Circuit adopted the rational relation test finding no FHA violation where a defendant demonstrated that its action was rationally related to a legitimate governmental interest.  Two of the other three circuits which have addressed this issue determined that once a plaintiff has established an ordinance is facially discriminatory, a defendant can present one of two possible justifications for the discriminatory ordinance:  (1) legitimate public safety concerns; or (2) that the restriction benefits the protected class.  *Cmty. House, Inc.*, 468 F.3d at 1125 (9th Cir.); *Bangerter*, 46 F.3d at 1503-04 (10th Cir.).

---

[6]In a recent unpublished opinion, the Eleventh Circuit employed the test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) in an FHA context.  *See Boykin v. Bank of Am. Corp.,* 162 Fed. Appx. 837 (11th Cir. 2005).  However, the facts of *Boykin* are substantially different than those in the present case.  In *Boykin*, the plaintiff was challenging a bank's treatment of her loan application.  Therefore, the case involved a discriminatory act during a residential real-estate related transaction against an individual being established through circumstantial evidence.  This case involves two pieces of legislation passed by a City and a facial discrimination challenge.  Plaintiffs' claims do not rely on circumstantial evidence, but instead relied on the City's legislation and its impact on handicapped individuals.  Therefore, the instant situation is not sufficiently analogous to the facts of *Boykin* to cause me to determine that the Eleventh Circuit would employ a *McDonnell Douglas* test here.  *See Cmty. House, Inc. v. City of Boise, Idaho*, 468 F.3d 1118, 1124 (9th Cir. 2006)(discussing how the *McDonnell Douglas* test is inapplicable to facial discrimination challenges under the FHA).

14

In refusing to use the rational relation test employed in *Familystyle*, the Tenth Circuit discussed how an equal protection analysis is misplaced where in an FHA claim a handicapped plaintiff is bringing a claim based on a statute of which he or she is the "direct object of the statutory protection." *Bangerter*, 46 F.3d at 1503. The Ninth Circuit adopted the Tenth Circuit test arguing a similar distinction. It discussed how those protected by the FHA were not necessarily protected classes for constitutional purposes, thereby not making the rational relation test appropriate. *Community House, Inc.*, 468 F.3d at 1125 (discussing how this standard is also more in line with the Supreme Court's analysis in *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.v. Johnson Controls, Inc.*, 499 U.S. 187 (1991)). The Sixth Circuit did not adopt either the *Bangerter* or the *Familystyle* test, but instead stated that "in order for facially discriminatory statutes to survive a challenge under the FHAA, the defendant must demonstrate that they are 'warranted by the unique and specific needs and the abilities of those handicapped persons' to whom the regulations apply." *Larkin*, 89 F.3d at 290 (quoting *Marbrunak, Inc.,* 974 F.2d at 47). I agree that a rational relation test is not appropriate where the individuals bringing this statutory claim are the direct object of its protection, the protection of which appears to have been intended to be greater than that provided by the rational relation test. I agree that the presence of either of the *Bangerter* justifications would allow a facially discriminatory statue to survive an FHA challenge.

However, I am not sure that the *Bangerter* test includes all possible justifications. As discussed below, I recognize a municipality's interest in protecting the residential character of a neighborhood, as was argued strenuously here, and its ability to legislate such protection. While I agree with the City that this is a legitimate interest, I also recognize that this protection must be legislated with the needs of those protected by the FHA in mind.

Having articulated possible justifications that would allow Ordinance 4649 to survive Plaintiffs' FHA challenge, this issue becomes whether such justifications are present in this case.

This is a difficult analysis where the City's primary justification was grouping compatible uses together, which is not one of the *Bangerter* justifications, nor is it a justification recognized by any of the other circuits that have addressed this issue.  That being said, I will evaluate all justifications the City put forth for Ordinance 4649 in an effort to determine whether, even if in combination, they support the Ordinance and allow it to withstand Plaintiffs' challenge.  There was some evidence at trial regarding public safety concerns[7] the City had about Provider Plaintiffs' residences.  In *Bangerter*, the court pointed out that the statute itself states that "[n]othing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."  *Bangerter*, 46 F.3d at 1503 (quoting 42 U.S.C. §3604(f)(9)).  The legislative history indicates that generalized perceptions of threats to safety should not support discrimination.  *See* H.R. Rep. No. 100-711, 1988 U.S. Code Cong. Admin News at p. 2179.  The residents spoke at the city council meeting about their fears that stemmed from Provider Plaintiffs' residences.  However, the transcript and video tape of the meeting admitted at trial did not support of a finding that any safety justification for this Ordinance was supported by a direct threat to the safety and health of others more so than generalized perceptions.  The City did not put forth any evidence regarding the relationship between the crime involved at the halfway houses and crime occurring at other non-halfway house residences in the area.  Accordingly, this evidence did not support a finding that Provider Plaintiffs' residences, or others that would fit the definition of substance abuse treatment facility, posed a direct threat to the health or safety of other individuals.

The City's main justification was that the Ordinance was passed to group together compatible uses, a common use of zoning ordinances.  Specifically, the City's argument was that

---

[7]The evidence consisted of a memorandum from the Chief of Police of the City detailing cases involving fatalities at the subject properties in a year and a half period and a list of incidents involving halfway houses in the City.

service providers or facilities that would meet the definition of a substance abuse treatment facility under the Ordinance, were commercial and medical in nature and therefore did not belong in a residential area.  However, the only activity required to bring a service provider or facility within the purview of the Ordinance is that the service provider or facility require tenants to perform testing to determine if they are drug and alcohol free as a term of their tenancy.  The language of the Ordinance[8] goes to a service provider or facility "used for room and board only and in which treatment and rehabilitation activities are provided at locations other than the primary residential facility, whether or not the facilities used for room and board and for treatment and rehabilitation are operated under the auspices of the same provider.  For purposes of this subparagraph (2), service providers or facilities which require tenants or occupants to participate in treatment and rehabilitation activities, or perform testing to determine whether tenants or occupants are drug and/or alcohol free, as a term or condition of, or essential component of, the tenancy or occupancy shall be deemed to satisfy the 'treatment and rehabilitation activities' component of the definition contained in this section."  It is not clear how this condition of tenancy turns a dwelling into a commercial facility, or at least more of a commercial facility than any residence rented or leased to occupants which would be by definition a commercial facility where it is viewed with regard to a profit.  The condition of tenancy would make no change to the outward appearance of the residence, be it a single family home or an apartment building.  The City put forth no evidence that an apartment building that required its tenants to be drug tested would somehow negate the fact that those individuals were

_____

[8]The Ordinance also includes in its definition of substance abuse treatment facilities a service provider or facility that is "[l]icensed or required to be licensed pursuant to F.S. §397.311(18)."  Florida Statute Section 397.311(18) defines "Licensed service provider" as "a public agency under this chapter, a private for-profit or not-for-profit agency under this chapter, a physician or any other private practitioner licensed under this chapter, or a hospital that offers substance abuse impairment services through one or more of the following licensable service components" and then goes on to list such components.  As discussed in further detail in the remedies section of this order, I conclude that this section of the Ordinance can remain.

living in the apartment building, making it their home.[9]  Instead, the City put forth evidence to establish that the residences offered by Provider Plaintiffs were more of a profit driven enterprise than a place where people actually lived.

I do not disagree with the City's position on this point.  However, Ordinance 4649 did not capture the use it was attempting to segregate.  The City was looking at Provider Plaintiffs and the services they provided to recovering addicts, including a program with three different phases, drug testing on site, transportation, group therapy meetings, medication control, money control, Alcoholic Anonymous and Narcotics Anonymous meetings on site, curfews, room inspections, bed checks, and individual therapy.  Recovering individuals spent limited time in each phase, requiring them to move from building to building.  The City also looked at Provider Plaintiffs' business model where they were marketing themselves as unique recovery programs, had a large office use in the main facility, charged individuals by the week with no regard for what unit they were in or how many individuals were living in the unit, and kept deposits from individuals who relapsed regardless of how many times they had previously relapsed while staying with Provider Plaintiffs.  The City found the combination of these uses and Provider Plaintiffs' business practices commercial in nature.  As I expressed at trial and earlier in this order, some of Provider Plaintiffs' business practices give me pause, particularly where Provider Plaintiffs are seeking protection from a statute which protects handicapped individuals, because many of the business practices employed by Provider Plaintiffs do not appear to serve the therapeutic needs of these handicapped individuals.  However, questionable business practices aside, the Ordinance does not capture the commercial and medical uses that underlie the City's justification, nor did the City prove either of the *Bangerter* factors justified the passage of the Ordinance.

_____

[9] Even the City's planning and zoning director testified that Provider Plaintiffs' apartment buildings look just like an apartment building.

Instead, the Ordinance, which hinges the location of a housing provider in a residential zone to whether that housing provider requires its residents to be subjected to drug testing as part of his or her occupancy, substantially limits the housing options for recovering individuals in the City.  Recovery from substance abuse is an ongoing struggle for many, which for a large number of such individuals may require at least some period of time living in a drug and alcohol free environment.  Regan's testimony established the substantial risk of relapse recovering individuals face and their need to be in a supportive drug and alcohol free environment to decrease such risk.  Regan testified that one can not absolutely determine if a living environment is drug and alcohol free unless its residents are drug tested.  There was also testimony at trial, by Regan, and the recovering individuals, as to the role a group living arrangement plays in their recovery, including helping to keep them clean because of the transparency, but also providing them with less opportunities for loneliness, a major trigger for relapse.  Other courts have acknowledged the role a group living arrangement plays in the recovery of substance abusers.  *See Corp. of the Episcopal Church in Utah*, 119 F.Supp.2d 1215, 1217-18 (D. Utah 2000)*; Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1183 (E.D. NY 1993); *U. S. v. Borough of Audubon, N.J.*, 797 F.Supp. 353, 358-59 (D. NJ 1991).  The need for handicapped people to live in group arrangements for support or to pool caretaker staff has been described as essential.  *Brandt,* 82 F.3d at 174; *see also Smith & Lee Assocs., Inc.*, 102 F.3d at 795-96 (discussing the need to allow group homes for the elderly to have at least nine residents in them for economic viability).  Such group living arrangements which are drug and alcohol free, thus necessitating drug testing, at the very least off site, fall within the purview of the Ordinance.  Based on this evidence the restriction that a housing provider who requires drug testing as an essential part of a tenant's occupancy only provide housing in a medical district or possibly in a motel/business district cannot be seen as a restriction that benefits recovering individuals.  Thereby, the City has limited the opportunities for recovering individuals to live in residential

19

areas of Boca Raton.

As discussed above, the City argued the Ordinance was aimed at commercial and medical uses. The City's list of such uses is much longer than just drug testing. However, the Ordinance includes none of these other uses. The City argued the Ordinance did not capture a mere housing provider that required drug testing where the Ordinance only captured "service providers or facilities." The Ordinance does use this language, however the distinction between who imposes the requirement, the residents of the group living arrangement or their landlord appears to be without significance to the impact on the residential character of the neighborhood. For example, a entity which wanted to provide substance free housing to twenty recovering individuals in ten one-bedroom apartments complete with drug testing as part of their lease to insure the substance free component of their environment, and AA and/or NA meetings in the building's common area would have to provide such housing in the medical district or apply for a conditional use in a motel/business district. Yet, under the City's distinction a building housing 90 people in 30 apartments subject to the same drug testing requirement discussed above and having the same AA and/or NA meetings, could be in the residential zone so long as the residents themselves got together and agreed to put the restrictions on themselves and arrange for the AA and/or NA meetings themselves. It is not clear that the difference of who imposes the requirements on residents is significant to the analysis of whether the use is a commercial one.[10] The City put forth no evidence which demonstrated that a sober living arrangement provided by a third party destroys the residential character of a neighborhood more than a sober living arrangement organized by the residents themselves.[11] Based on the evidence presented, the City's distinction does not cure the Ordinance's discriminatory impact. This is not to say that the City is precluded

---

[10]As discussed in the Joint Statement of the Department of Justice and the Department of Housing and Urban Development, group homes are often provided by an organization that provides housing and various services for individuals in the group homes. *See* Joint Statement of the Department of Justice and the Department of Housing and Urban Development, Group Homes, Local Land Use, and the Fair Housing Act *available at* http://www.usdoj.gov/crt/housing/final8_1.htm.

[11]*See supra* n. 9.

from attempting to separate the commercial from the residential.  As I stated earlier, Provider

Plaintiffs' residences include a lot more services than drug testing, and perhaps more than is

therapeutically necessary.

Therefore, my ruling regarding the Ordinance is not intended to limit the City's ability to

regulate what it sees, and what I saw as well from the evidence, as a commercial operation.  My

concerns are similar to those discussed by the Supreme Court in *Village of Belle Terre v. Boraas*,

416 U.S. 1 (1974) where it stated:

> The regimes of boarding houses, fraternity houses, and the like present urban
> problems.  More people occupy a given space; more cars rather continuously pass
> by; more cars are parked; noise travels with crowds.
> A quiet place where yards are wide, people few, and motor vehicles restricted are
> legitimate guidelines in a land-use project addressed to family needs.  This goal is
> a permissible one within Berman v. Parker, supra.  The police power is not
> confined to elimination of filth, stench, and unhealthy places.  It is ample to lay
> out zones where family values, youth values, and the blessings of quiet seclusion
> and clean air make the area a sanctuary for people.

*Boraas*, 416 U.S. at 9.  The sheer volume of individuals Provider Plaintiffs are housing within a

small geographic location contributes to setting Provider Plaintiffs' housing opportunities apart

from the residences that surround it.  This is in addition to the transitory nature of the housing

where residents are shifted through different buildings depending on what phase of the program

they are in.  I recognize that Provider Plaintiffs' facilities are apartment buildings amidst other

apartment building and therefore to the naked eye one may not see Provider Plaintiffs' buildings

as the pig in the parlor.  However, because of the congregation of Provider Plaintiffs' facilities

and the multitude of services offered by Provider Plaintiffs, a closer examination would bring to

light the difference between Provider Plaintiffs' facility and an average residential apartment

building.  As discussed in *Boraas,* the ability to protect the residential nature of a neighborhood

is not limited to controlling the negatives that obviously do not conform with the area, but

includes the ability to set apart areas where people make their home from the rest of the City.

While I agree that recovering individuals need to be given the opportunity to live in group

21

arrangements as discussed earlier, such arrangements need not include approximately 390 people in a group of buildings all within a quarter of a mile of each other.  Once again the City's Ordinance does not directly address this concern.  Even though I agree with the City's ability to protect the residential character of the neighborhood and Provider Plaintiffs' possible impact on that character in this case, the link between the Ordinance and the protection of the residential character of the neighborhood is not a direct one.

The City did not present sufficient evidence to justify the Ordinance based on legitimate public safety concerns or to demonstrate that the restriction imposed benefitted the recovering individuals.  In this case, neither of the *Bangerter* justifications are present.  In addition, the City's justification of grouping like uses together is not a sufficient justification where protecting the residential character of its neighborhoods could have been legislated in a less discriminatory way such that it did not substantially limit the availability of residential housing to recovering individuals.

**Section 28-2**

I must now turn to Section 28-2 of the City Code, the City's definition of family.  The analysis regarding this Section is different than that of the Ordinance.  Section 28-2 by its own terms does not refer to recovering individuals or substance abuse.  Instead, Section 28-2 treats all individuals, handicapped and non-handicapped, provided they are unrelated or not within the Section's two exceptions, foster children and domestic servants, alike.  Four non-handicapped non-related people cannot live in a single dwelling, just as four recovering individuals cannot live in a single dwelling.  Therefore, this Section is more appropriately examined for its disparate impact on handicapped individuals.  *See RECAP*, 294 F.3d at 52.  A disparate impact analysis should be employed where a facially neutral section of the city code is examined to determine its differential impact on a protected group under the FHA.  *See RECAP*, 294 F.3d at 52.  To succeed on a disparate impact theory, plaintiffs must provide evidence that the neutral practice

22

had a disproportionate impact on the protected class.  *RECAP*, 294 F.3d at 52-53; *2922 Sherman Ave. Tenants' Ass'n v. D.C.*, 444 F.3d 673, 681 (D.C. Cir. 2006).  The question in this case is whether limiting the occupancy of a single dwelling in the City to three unrelated people has a disproportionate impact on recovering individuals.

Plaintiffs' argument at trial was that it did where recovering individuals often require the availability of group living arrangements as part of their recovery.  The City argued that this provision does not violate the FHA where there are other possibilities for a group home of recovering individuals in a residential area of the City.  The evidence at trial supported the conclusion that recovering individuals often need group living arrangements as part of their recovery for a variety of reasons.  Two of the reasons, as discussed by Regan, are decreasing the possibility of relapse by decreasing the feelings of loneliness and increasing the supervision due to the accountability present when people live together.  Regan's testimony has previously supported such findings.  *See Town of Babylon*, 819 F.Supp. at 1183.  The last reason, as discussed earlier in this order, is the economic viability of providing housing to handicapped people.  This reason has also been recognized in the law.  *Brandt*, 82 F.3d at 174; *Smith & Lee Assocs., Inc.*, 102 F.3d at 795-96.  Plaintiffs' position is further bolstered by an examination of the Oxford House model.  Oxford Houses, the work of a non-profit organization which helps recovering individuals establish group sober homes, require a minimum of six residents to receive a charter for the proposed home.  The Oxford House Manual, *available at* http://www.oxfordhouse.org.   The City argued that groups of recovering individuals could live together under other provisions of the City Code.  For example, the City pointed to the community residential homes allowed for by the City Code and detailed in Florida Statute Section 419.001.  However, the Florida statute requires community residential homes to be licensed by the Agency for Health Care Administration or that the handicapped residents of such a home be a client of one of four different state agencies.  Fla. Stat. §419.001.  Limiting the

23

possibility of recovering individuals to live in a residential area only if they become licensed or are clients of a state agency limits their housing options.  Based on the foregoing, I agree with Plaintiffs that Section 28-2 impacts recovering individuals more than non-recovering individuals.

Once Plaintiffs establish this disproportionate impact on the handicapped, the burden is shifted to the City to prove that the action furthered "a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988); *See Town of Babylon*, 819 F.Supp. at 1183.  The City argued that this definition of family furthered a variety of governmental interests, including controlling population density and preserving the single family character of the City's residential areas.  I agree that the preservation of a residential character is a legitimate governmental interest.  However, in this case the City did not demonstrate that there was no less discriminatory alternative means to accomplish this goal. Section 28-2 makes no exception for a group home for recovering individuals who merely want to live in a single family home and would not impact the residential character of the neighborhood. Section 28-2 provides two other exceptions and the City put forth no evidence to explain why allowing a similar exception for recovering individuals would destroy the residential character of the neighborhood.

The no less discriminatory means is further exemplified by the City's lack of any established procedure by which handicapped individuals could request a reasonable accommodation to the occupancy limitation.  Discrimination under the FHA includes denying or making a dwelling unavailable because of a handicap, including refusing to make reasonable accommodation in rules, policies, practices, or services such that would be necessary to afford such person the opportunity to use and enjoy a dwelling.  *See* 42 U.S.C. §3604(f)(3)(B).  There was no evidence that a reasonable accommodation to Section 28-2 was available.  The City put

24

forth evidence of a Petition for Special Case Approval form which it argued an individual would use to request for reasonable accommodation.  Neither reasonable accommodation, nor disability were mentioned on the form.  There was no evidence of such form having been used historically by handicapped individuals to request a reasonable accommodation.  There was no evidence that the form was referenced anywhere else in the City Code that dealt with reasonable accommodation requests.  Where Section 28-2 itself provides no exception for handicapped individuals and the City's Code has no clearly established procedure that would allow a handicapped individual, group of individuals, or provider of group homes, to request a reasonable accommodation of the occupancy limitation, the City has not demonstrated that no less discriminatory alternative to Section 28-2 would serve the same interest.  Therefore, Section 28-2 as written violates the FHA.

This is not to say that the City's occupancy limitation of three unrelated people is not permitted should the City legislate it in a less discriminatory fashion.  The Plaintiffs argued that *City of Edmonds* suggests that such caps violate the FHA.  I do not read *City of Edmonds* to make such suggestion.  *City of Edmonds*, 514 U.S. 725.  *City of Edmonds* held that the type of limitation used here, "the family-defining kind," is not exempted from the FHA by 42 U.S.C §3607(b)(1).  *Id.* at 728.  Instead, the Court held, the exemption only applies to "total occupancy limits, i.e., numerical ceilings that serve to present overcrowding in living quarters."  *Id.*  The question before me is not whether Section 28-2 falls within 42 U.S.C. §3607(b)(1)'s purview.

I do not think the FHA is violated merely by having a cap on the number of unrelated individuals who can live in a single family dwelling.  Furthermore, I find nothing wrong with the number three that the City has chosen.  A city must draw a line somewhere.  The number chosen is in line with the average occupants per unit within the City.  The number of individuals per unit on average was less than three.  As eloquently stated by Justice Holmes, "[n]either are we troubled by the question where to draw the line.  That is the question in pretty much everything

25

worth arguing in the law." *Irwin v. Gravit*, 45 S.Ct. 475, 476; *see Boraas*, 416 U.S. at 8 (stating that every line a legislature draws leaves out some that might as well have been included, the use of such discretion is a legislative function); *see also Smith & Lee Assocs., Inc.*, 102 F.3d at 797 n. 13 (discussing the fine line drawn between a group home of nine residents not substantially altering the residential character of a single-family neighborhood while a twelve resident group home would more likely do so).  While I find no legal problem with the cap of three unrelated individuals per se, the limitation without any exception for handicapped individuals or an established reasonable accommodation procedure violates the FHA.

This is not to say that recovering individuals should have a blanket exemption from a cap on the number of unrelated people that can live in a dwelling in a residential district of the City. Nor is it to say that the City cannot limit Provider Plaintiffs' units to three unrelated people per unit.  There was testimony at trial that Provider Plaintiffs could be profitable and have therapeutic success with only three people per apartment.  All of this can be considerations in attempting legislate a capacity limitation that complies with the FHA.

My ruling here is not intended to limit the City's ability to regulate the residential character of its neighborhoods.  As discussed above, I agree with the City that preservation of the residential character of its neighborhoods is a legitimate governmental interest.  However, the impact of these two zoning sections limits the ability of recovering individuals to obtain housing in residential areas of Boca Raton.  They did not with little, if any, evidence as to how the presence of recovering individuals destroys the residential character.  The City may regulate the residential character of its neighborhoods, so long as they devise a means to protect the ability of recovering people to live in the residential neighborhoods in a meaningful way which takes in mind their need for a group living substance free environment.

**Remedies**

At the conclusion of the bench trial, I asked each of the parties, and the Department of

Justice, who has a related case pending against the City, to submit recommendations as to an appropriate remedy in this case. I told the parties "I would like to accomplish the purpose but do it as narrowly[12] as possible." Despite this request, both parties essentially argued their positions again, including suggesting the broadest remedy available to each of them. I decline to adopt any of the positions offered given the facts of the case and the precedent on the issue of remedies.

Having found that the Ordinance and Section 28-2 violate the FHA, the question before me is whether they should both be stricken, as Plaintiffs suggest, or if I should more narrowly tailor the relief as I alluded to at the conclusion of the bench trial. The precedent supports a narrow tailoring. *See Ayotte v. Planned Parenthood of N. New England, et al.*, 546 U.S. 320, 126 S.Ct. 961 (2006). In *Ayotte*, Justice O'Connor addressed a similar predicament. The Court specifically held "that invalidating the statute entirely is not always necessary or justified, for lower courts may be able to render narrower declaratory and injunctive relief." *Ayotte*, 126 S.Ct. at 964. In this case I attempt to achieve the result I think is necessary as narrowly as possible.

As to Ordinance 4649, the primary difficulties with this Ordinance involve the second definition and its subsection. I find no violation of the FHA by the City's first definition, those service providers or facilities that are "licensed or required to be licensed pursuant to Section 397.311(18) Fla. Stat." This statute details various licensable service components and defines an entity as a licensed service provider if it offers substances abuse impairment services through one or more such licensable service components. Nothing in the statute indicates that by not allowing a licensed service provider to be located in a residential area, the City is precluding recovering individuals from living in residential areas where recovering individuals can reasonably live in residential areas of the City without needing two or more of the licensable service components listed in Section 397.311(18). Accordingly, section one of Ordinance 4649

---

[12] I went further to explain that "It doesn't help me to say just strike everything and enjoin everything. . . . I need something better than that. And the same thing goes for the city. You know, the more specificity –in fact, even – if you were going to deal with the ordinances, specific excisements, if that's how we would handle it. And if there's procedure that you would suggest I order, a specific language. You know, concepts aren't as much helpful at this point to me as language."

shall remain in effect.         While I have ideas, some of which are expressed herein and others of which were discussed at trial, about how section two of the Ordinance could be written to better serve the City's justification and comply with the FHA, I decline to re-write the Ordinance. My decision is based on the roles of the legislature and judiciary, but also on a principle Justice O'Connor discussed in *Ayotte*.  Courts should not determine to whom a statute should apply where a legislature has cast its net widely because this would put the judiciary in the legislature's role.  *See Ayotte*, 546 U.S. at 968.  Therefore, I decline to parse the second definition or to add my own words to it.  The City is enjoined from enforcing section two of Ordinance 4649.

Section 28-2 is not susceptible to parsing either.  However, given my discussion above, I am going to temporarily enjoin enforcement of section 28-2 against recovering addicts until such time as the City passes a reasonable accommodation procedure.  The City must provide a process by which a request for reasonable accommodation on the basis of one's disability could be requested.[13]  Accommodations are to give consideration for the limitations caused by the disability.  This remedy does not enjoin the City against enforcing this provision of the City Code against Provider Plaintiffs.  I reach this conclusion not only because of my position that while recovering individuals need an accommodation to allow for group living situations, I found no evidence which persuaded me that this maxim requires Provider Plaintiffs to have more than three individuals in each of their units.  As discussed above there was evidence that Provider Plaintiffs' facilities can be therapeutically successful and profitable with three individuals per unit.

My position as to Provider Plaintiffs being excluded from this temporary enjoinment is also based on Provider Plaintiffs' unclean hands where they previously agreed to comply with section of the City Code demonstrating their ability to do so and continue to offer housing to

---

[13]As discussed in the Joint Statement, local governments should "make efforts to insure that the availability of [reasonable accommodation request] mechanisms is well known within the community."  Joint Statement at page 4. There was no evidence that the Petition for Special Case Approval form was well known as the avenue to a reasonable accommodation.  Instead, the testimony was that the Petition for Special Case Approval form was a catch all application.

recovering individuals.  Misconduct by a plaintiff which impacts the relationship between the parties as to the issue brought before the court to be adjudicated can be the basis upon which a court can apply the maxim of unclean hands.  *See Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (11th Cir. 1979).  The maxim of 'he who comes into equity must come with clean hands' has been said to close the door of equity to a litigant tainted by inequitableness as to the matter about which the litigant seeks relief.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  This principle requires the litigant to act "fairly and without fraud or deceit as to the controversy in issue."  *Id.* at 814-15. Where Provider Plaintiffs can continue to provide housing to recovering individuals while complying with Section 28-2 and they previously agreed to, I find it unnecessary to enjoin enforcement against them.

**Damages**

As to damages, the Individual Plaintiffs asserted that their injury included the humiliation of community disdain, the compromise of their anonymity as to their recovering status, and the stress of possibly losing their sober housing.  I do not doubt the humiliation the Individual Plaintiffs felt as they listened to the city council meeting where the Ordinance was addressed. However, many of them did not even attend the meeting.  Their testimony regarding their emotional harm was conclusory and was not specific such that it convinced me of the nature and extent of their emotional harm.  *See, e.g., Bailey v. Runyon*, 220 F.3d 879, 880-81 (8th Cir. 2000)(discussing how a plaintiff's own testimony can be sufficient but is not necessarily the sine qua non to establishing evidence of emotional harm).  Plaintiffs did not put forth any evidence of ramifications of their emotional distress.  *See, e.g., Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1254-56 (4th Cir. 1996).  The City was required to hold the public meeting and allow members of the public to speak to the Ordinance.  *See* Fla. Stat. §166.041.  In this case, I find the statements made at a democratic function were not sufficient to establish injury.  The City

29

delayed application of the Ordinance until 18 months after the rendition of a final non-appealable order in this case. The Individual Plaintiffs did not have to suffer the loss of sober housing and have had ample opportunity to address such a possibility where this lawsuit has been pending for over three years. I do not find Individual Plaintiffs established a concrete injury sufficient to sustain a compensatory damage award.

Similarly, the damages claimed by Provider Plaintiffs are unwarranted where they are speculative. A damage award must be based on substantial evidence, not speculation. *See Kenner v. Sizzler Family Steak House*, 597 F.2d 453, 457 (5th Cir. 1979).[14] Provider Plaintiffs claimed lost revenues where they were unable to grow their business due to the uncertainty of this litigation, mainly premised on their inability to obtain financing for another apartment building due to this litigation. Provider Plaintiffs presented a damages expert. However, he relied on an appraisal price of the building with no evidence to establish Provider Plaintiffs could have bought the building at that price. There was no evidence regarding the listing price of the building and the seller's agreement to Provider Plaintiffs' price. There was also no evidence regarding the increased demand for the type of housing Provider Plaintiffs provided such that they would be able to fill another building. In sum, the evidence was speculative that Provider Plaintiffs would have made the profits articulated, but for the Ordinance and Section 28-2.

Despite not having found sufficient evidence to establish a need for compensatory damages, I do think that Plaintiffs are entitled to an award of nominal damages. "Nominal damages are a trifling sum awarded to a plaintiff in an action, where there is no substantial loss or injury to be compensated, but still the law recognizes a technical invasion of his rights or breach of the defendant's duty, or in case where, although there has been a real injury, the plaintiff's evidence fails to show its amount." BLACK'S LAW DICTIONARY 392 (6th ed. 1990). While the Eleventh Circuit has stated that merely a violation of a purely statutory right does not

---

[14]Decisions of the United States Court of Appeals for the Fifth Circuit that as existed on September 30, 1981 are binding on the United States Court of Appeals for the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

mandate an award of nominal damages for such statutory violation, it has not precluded such an award where the district court finds it appropriate. *See Walker v. Anderson Elec. Connectors*, 944 F.2d 841, 845 (11th Cir. 1991). The Supreme Court has recognized the role that nominal damages play in cases where there is no concrete damage to compensate, but it is important to observe an individuals' rights. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n. 11 (1986). The Sixth Circuit has stated that at a minimum an award of nominal damages would be appropriate where a plaintiff proved a violation of the FHA and that he suffered a non-quantifiable injury as a result. *See Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224 (6th Cir. 2003); *see also Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F.Supp.2d 456, 464 (D. Md. 2000)(finding an award of nominal damages appropriate in a violation of the FHA case where plaintiff failed to show actual damage). Plaintiffs did not present evidence sufficient to sustain a damage award. However, this should not detract from the finding that the City violated the FHA. This is particularly true where as discussed above the statutory claim which Plaintiffs bring entitles them to greater protection than their constitutional rights would provide to a similar claim and nominal damages are required for a violation of constitutional rights. *See Walker*, 944 F.2d at 845(discussing how *Carey v. Piphus*, 435 U.S. 247 (1978) applies only to violations of constitutional magnitudes). In order to not take away the importance of such violation, I conclude that an award of nominal damages is appropriate.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiffs as to their Federal Fair Housing Act claims. Judgment is entered in favor of Plaintiffs against Defendant in the amount of $1.00 as to each Plaintiff. It is FURTHER ORDERED AND ADJUDGED that the City is enjoined from enforcing section 2 of Ordinance 4649 and is enjoined from enforcing Section 28-2 as to recovering individuals until such time as the City passes a reasonable accommodation procedure. Plaintiffs' remaining claims are dismissed. Judgement shall be entered in accordance with this Order.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this 26th day of February, 2007.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record